# SUPREME COURT OF THE UNITED STATES

## CID C. FRANKLIN *v.* NEW YORK

### ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF APPEALS OF NEW YORK

No. 24–330.　Decided March 24, 2025

The petition for a writ of certiorari is denied.

Statement of JUSTICE ALITO respecting the denial of certiorari.

I agree that we should not grant certiorari in this case, but in an appropriate case we should reconsider the interpretation of the Confrontation Clause that the Court adopted in *Crawford* v. *Washington*, 541 U. S. 36 (2004), and has elaborated in later cases. Overturning established precedent, the *Crawford* Court claimed that its new interpretation captured the original meaning of the Confrontation Clause as revealed by then-recent scholarship*, id.*, at 60–61, and that this interpretation would avoid the "unpredictable and inconsistent" results that had occurred under the test it overturned, *id.*, at 66.

Subsequent developments have undermined these two pillars of *Crawford*'s rationale. Historical research now calls into question *Crawford*'s understanding of the relevant common law rules at the time of the adoption of the Sixth Amendment, and whatever else may be said about that decision, there can be no dispute that it has not produced predictable and consistent results. Despite repeated attempts to explain what *Crawford* meant by "testimonial statements," our Confrontation Clause jurisprudence continues to confound courts, attorneys, and commentators.[1]

--------

[1] See, *e.g.*, R. Allen, J. Hoffman, D. Livingston, A. Leipold, & T. Meares, Comprehensive Criminal Procedure 1416 (5th ed. 2020) ("astonishing"); E. Sheley, The Dignitary Confrontation Clause, 97 Wash. L. Rev. 207, 223 (2022) ("morass"); D. Tuerkheimer, Exigency, 49 Ariz. L. Rev. 801,

Petitioner asks us to remedy this confusion by clarifying what qualifies as a "testimonial statement" under our post-*Crawford* case law. See *Smith* v. *Arizona*, 602 U. S. 779, 783–789, 799–802 (2024) (discussing our "varied formulations" of *Crawford*'s "testimonial inquiry"). But the real problem may be *Crawford* itself and its conclusion that the Confrontation Clause codified a well-established common law right against the use of any "testimonial" statement made out of court by a person who is available to testify and was not previously subject to cross-examination by the defendant. 541 U. S., at 68.

In order to reach this conclusion, the Court was required to hold that any person who makes a "testimonial" statement (whatever that means) is a "witness" within the meaning of the Confrontation Clause, but this gave the term "witness" a meaning that is radically different from its meaning in the neighboring Compulsory Process Clause and elsewhere in the Constitution. See A. Amar, Confrontation Clause First Principles: A Reply to Professor Friedman, 86 Geo. L. J. 1045, 1045–1047 (1998); A. Amar, Foreword: Sixth Amendment First Principles, 84 Geo. L. J. 641, 647 (1996).

───────────

832, n. 173 (2007) ("incoherent"); J. Widdison, Comment, *Michigan v. Bryant*: The Ghost of *Roberts* and the Return of Reliability, 47 Gonz. L. Rev. 219, 240 (2011) ("unstable"); A. Eichner, Note, The Failures of *Melendez-Diaz v. Massachusetts* and the Unstable Confrontation Clause, 38 Am. J. Crim. L. 437 (2011) (same); M. Spottswood, Truth, Lies, and the Confrontation Clause, 89 U. Colo. L. Rev. 565, 611 (2018) ("unnecessarily complex"); J. Ross, After *Crawford* Double-Speak: "Testimony" Does Not Mean Testimony and "Witness" Does Not Mean Witness, 97 J. Crim. L. & C. 147 (2006) ("double-speak"); D. Crump, Overruling *Crawford v. Washington*: Why and How, 88 Notre Dame L. Rev. 115, 132 (2012) ("unworkable"); D. Noll, Constitutional Evasion and the Confrontation Puzzle, 56 Boston College L. Rev. 1899, 1903 (2015) ("mess" (internal quotation marks omitted)); G. Fisher, The *Crawford* Debacle, 113 Mich. L. Rev. First Impressions 17, 24 (2014) ("*inherently*, and therefore *permanently*, unpredictable'" (quoting *Crawford*, 541 U. S., at 68, n. 10)).

The Compulsory Process Clause, which follows immediately after the Confrontation Clause, gives a defendant the right "to have compulsory process for obtaining *witnesses* in his favor." Amdt. 6 (emphasis added). And it is clear that these "witnesses" are people who are subpoenaed to appear in court and testify. The Court has understood the Clauses' neighboring references to "witnesses" as two sides of the same coin. See *Washington* v. *Texas*, 388 U. S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense"). After *Crawford*, however, only the Compulsory Process Clause's "witnesses" are people who must appear in court and take the stand. When a law uses the same term more than once, we presume that the term means the same thing every time it is used. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012). Thus, it is startling to hold that the term "witnesses" in two provisions separated by nothing but a semicolon have very different meanings.

Other provisions of the Constitution that use the term "witnesses" also refer to people who testify in court. The Treason Clause states that "[n]o Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." Art. III, §3, cl. 1. This provision requires two live witnesses who take the stand. See M. Hale, Pleas of the Crown 262 (1694); J. Langbein, The Origins of Adversary Criminal Trial 238–239 (2003); Amar, 86 Geo. L. J., at 1047.

These powerful textual arguments were known when *Crawford* was decided, but the Court dismissed them because its study of history led it to believe that the Confrontation Clause was meant to codify a well-established common law right against the introduction of a certain category

of what we now call hearsay.  More recent scholarship, however, casts doubt on key aspects of *Crawford*'s reasoning.[2]

Our body of constitutional decisions would be in perpetual turmoil if we reconsidered every decision resting on an interpretation of history that is subsequently challenged in the law reviews.  But as both JUSTICE GORSUCH and I recognize, the current state of our Confrontation Clause jurisprudence is unstable and badly in need of repair.  If we undertake that project, we should not limit our efforts to an attempt to shore up what may be a fundamentally unsound structure.

If we reconsider *Crawford*, as I think we should, the result might be a reaffirmation of *Crawford* or the adoption of an entirely different Confrontation Clause rule.  But whatever the outcome might be, reconsideration is needed.

––––––––––

[2] See, *e.g.*, T. Davies, Not "The Framers' Design": How the Framing-Era Ban Against Hearsay Evidence Refutes the *Crawford-Davis* "Testimonial" Formulation of the Scope of the Original Confrontation Clause, 15 J. L. & Pol'y 349 (2007); Noll, 56 Boston College L. Rev., at 1904–1905, 1918–1950; Spottswood, 89 U. Colo. L. Rev., at 595–596; D. Sklansky, Hearsay's Last Hurrah, 2009 S. Ct. Rev. 1, 5–6, 36–38, 46–47, 54; B. Trachtenberg, Confronting Coventurers: Coconspirator Hearsay, Sir Walter Raleigh, and the Sixth Amendment Confrontation Clause, 64 Fla. L. Rev. 1669, 1677–1681 (2012); J. Bellin, The Incredible Shrinking Confrontation Clause, 92 B. U. L. Rev. 1865, 1881–1893 (2012); T. Davies, What Did the Framers Know, and When Did They Know It? Fictional Originalism in *Crawford v. Washington*, 71 Brooklyn L. Rev. 105, 106–107 (2005); R. Kry, Confrontation Under the Marian Statutes: A Response to Professor Davies, 72 Brooklyn L. Rev. 493 (2007); T. Davies, Revisiting the Fictional Originalism in *Crawford*'s "Cross-Examination Rule": A Reply to Mr. Kry, 72 Brooklyn L. Rev. 557 (2007).

# SUPREME COURT OF THE UNITED STATES

## CID C. FRANKLIN *v.* NEW YORK

### ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF APPEALS OF NEW YORK

No. 24–330.   Decided March 24, 2025

Statement of JUSTICE GORSUCH respecting the denial of certiorari.

While Cid Franklin awaited arraignment after his arrest, an employee of the Criminal Justice Agency questioned him outside the presence of counsel. That publicly funded agency interviews "nearly all individuals arrested in New York City" in order to make bail recommendations to the arraigning judge. 42 N. Y. 3d 157, 159, 242 N. E. 3d 652, 653 (2024) (internal quotation marks omitted).

Much later, prosecutors sought to make a different use of Mr. Franklin's bail report. At trial, they introduced it as evidence of his guilt. See App. to Pet. for Cert. 33a (exhibit). And they did so without giving him a chance to cross-examine the report's author. Relying on the report, which "was central to the People's case at trial," a jury convicted Mr. Franklin. 42 N. Y. 3d, at 160, 242 N. E. 3d, at 654.

On appeal, Mr. Franklin argued that this use of the bail report violated his Sixth Amendment right to confront the witnesses against him. The New York Court of Appeals disagreed. It reasoned that the Sixth Amendment only bars the use of "'testimonial'" out-of-court statements. *Id.*, at 161, 242 N. E. 3d, at 655 (quoting *Crawford* v. *Washington*, 541 U. S. 36, 51 (2004)). And a statement qualifies as "testimonial," the court continued, only if it "was created for the primary purpose of serving as trial testimony." 42 N. Y. 3d, at 159, 242 N. E. 3d, at 653. Applying that test, taken from this Court's decision in *Michigan* v. *Bryant*, 562 U. S. 344 (2011), the Court of Appeals concluded that Mr. Franklin's

bail report was written principally for "administrative" pur-
poses and not primarily for use at trial. 42 N. Y. 3d, at 165,
242 N. E. 3d, at 658. Therefore, the court reasoned, it did
not qualify as testimonial. *Ibid.*

It's hard to fault the Court of Appeals for applying a "pri-
mary-purpose" test in assessing Mr. Franklin's Sixth
Amendment claim. After all, this Court endorsed the test
just last year in *Smith* v. *Arizona*, 602 U. S. 779, 800 (2024).
But even if that judge-made test may have some useful role
to play, it seems to me that treating it as a necessary con-
dition to relief under the Confrontation Clause can pose
problems too, risking results that sit uneasily with the
Clause's original meaning. It is a concern I raised in
*Smith*—and one that, to my eyes, this case highlights. *Id.*,
at 806 (opinion concurring in part).

Consider briefly some of what we know about the Sixth
Amendment. Beginning in the 16th century, Parliament
required magistrates "to examine suspects and witnesses"
before trial and to "certify the results to the court." *Craw-
ford*, 541 U. S., at 43–44. Apparently, an important pur-
pose of those examinations was to ensure that the defend-
ant and key witnesses would appear at trial, not to generate
admissible evidence. See J. Langbein, Prosecuting Crime
in the Renaissance 24 (1974). Still, prosecutors sometimes
introduced those examinations at trial instead of calling
live witnesses, effectively denying defendants a chance to
cross-examine their accusers. See *Crawford*, 541 U. S., at
44. By the founding, the common law had largely turned
against that practice. See J. Beattie, Crime and the Courts
in England 1660–1800, pp. 270–271, 363–365 (1985). Rec-
ognizing as much, this Court in *Crawford* held that the "use
of *ex parte* examinations as evidence against the accused"
was one of the "principal evil[s] at which the Confrontation
Clause was directed." 541 U. S., at 50.

Now return to Mr. Franklin's case. The Court of Appeals
applied the primary-purpose test to approve something that

looks very similar to what the Confrontation Clause was adopted to prevent—the use at trial of a pretrial examination as evidence against the accused "in lieu of live testimony" subject to cross-examination. *Id.*, at 43.

Perhaps there is some way to reconcile this apparent tension. But perhaps, too, the tension here should give us reason to ask some questions about the "primary-purpose" test itself. Start with this one: Where does it come from? The test appears nowhere in the text of the Sixth Amendment, nor have our decisions sought to justify it by reference to the Amendment's original meaning and the historic practices that informed it. Really, where the primary-purpose test "comes from is anyone's guess." *Williams* v. *Illinois*, 567 U. S. 50, 135 (2012) (KAGAN, J., dissenting).

Seemingly, the first mention of "primary purpose" in our Sixth Amendment jurisprudence came in *Davis* v. *Washington*, 547 U. S. 813, 822 (2006). Even there, however, the Court did not purport to suggest that every Confrontation Clause claim must run the primary-purpose gauntlet. Instead, *Davis* used the phrase "primary purpose" merely as shorthand to describe some situations in which an out-of-court statement will qualify as "testimonial" and thus implicate the Confrontation Clause. *Ibid.* Reading any more into its discussion, *Davis* emphasized, would be a mistake, since it was not "attempting to produce an exhaustive classification of all conceivable statements . . . as either testimonial or nontestimonial." *Ibid.*

Admittedly, and despite that admonition, some of our later cases seized on *Davis*'s discussion of "primary purpose" and sought to transform it into a kind of "grand unified theory" for assessing Confrontation Clause claims, a test that must be satisfied in every case. *American Legion* v. *American Humanist Assn.*, 588 U. S. 29, 60 (2019) (plurality opinion). But even after years of toiling with that project, our cases have never quite settled on what the primary-purpose test *is*. As we candidly acknowledged last

year in *Smith*, the Court has offered a number of "varied" and seemingly inconsistent "formulations." 602 U. S., at 800; see also *State* v. *Mattox*, 2017 WI 9, ¶63, 373 Wis. 2d 122, 161, 890 N. W. 2d 256, 277 (Abrahamson, J., dissenting) ("[T]he U. S. Supreme Court has not adopted a single, definitive formulation of the primary purpose test"); *People* v. *Fontenot*, 509 Mich. 1073, 1079, 975 N. W. 2d 919, 925 (2022) (McCormack, C. J., concurring) ("[T]he proper formulation of the primary-purpose test is unclear").

Consider a few examples. Perhaps the most demanding articulation of the primary-purpose test came in *Bryant*, where the Court indicated that an out-of-court statement qualifies as testimonial if it was procured "with a primary purpose of creating an out-of-court *substitute for trial testimony*." 562 U. S., at 358 (emphasis added). More forgivingly, in *Melendez-Diaz* v. *Massachusetts*, the Court said that a statement qualifies as "testimonial" if it was "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be *available for use at a later trial*.'" 557 U. S. 305, 310 (2009) (emphasis added). Differently still, *Davis* suggested that statements "made in the course of police interrogation . . . are testimonial when . . . the primary purpose of the interrogation is to establish or prove past events *potentially relevant to later criminal prosecution*." 547 U. S., at 822 (emphasis added). And in yet another iteration, *Smith* said the relevant question is whether a statement was prepared with a "'*focus on court*.'" 602 U. S., at 802 (emphasis added).

It might be possible, I suppose, to harmonize these discordant variations. But lower courts have generally felt compelled to pick one version or another, and a defendant's conviction or acquittal can hang on that choice. See, *e.g.*, *United States* v. *Miller*, 982 F. 3d 412, 436 (CA6 2020) ("Were [the statements] testimonial? It might depend on which of the Supreme Court's varied 'primary-purpose' tests we apply").

Just look again at what happened to Mr. Franklin in the Court of Appeals. There, a majority applied *Bryant*'s version of the test, asking whether the primary purpose of Mr. Franklin's bail report "was to create an out-of-court substitute for trial testimony." 42 N. Y. 3d, at 164, 242 N. E. 3d, at 657. Under that standard, the report struck the majority as nontestimonial. Meanwhile, the dissent thought the bail report testimonial because, even if it wasn't created as a substitute for trial testimony, it was created for use in court and was available for use at trial, considerations *Smith* and *Melendez-Diaz* have suggested are enough to trigger the Sixth Amendment. See 42 N. Y. 3d, at 176, 242 N. E. 3d, at 666 (Aarons, J., dissenting).

If deciding which primary-purpose test to use can pose lower courts with a challenge, applying any version of it may be no easier. *Bryant* suggested that a court must "objectively" determine an out-of-court statement's "'primary purpose.'" 562 U. S., at 360. But how is a court supposed to do that? Must it take evidence and conduct a mini-trial about the circumstances of each utterance? See *id.*, at 370 (suggesting that courts must analyze "the statements and actions of all participants" in an out-of-court encounter). What, too, is a court supposed to do when the evidence indicates that an officer had one "primary purpose" in mind when soliciting an out-of-court statement and the declarant had another? See *id.*, at 383 (Scalia, J., dissenting). In cases like that, what is to keep an "objective" inquiry from devolving into raw judicial choice, inviting in the process different results from different judges in similar cases? See *Kennedy* v. *Bremerton School Dist.*, 597 U. S. 507, 533–534 (2022) (noting problems with a not-dissimilar "reasonable observer" inquiry); *Smith*, 602 U. S., at 806–807 (GORSUCH, J., concurring in part); cf. *Davis*, 547 U. S., at 841–842 (THOMAS, J., concurring in judgment in part and dissenting in part). The challenges associated with apply-

ing the primary-purpose test only seem to compound fur-
ther when one considers the immense variety of out-of-court
statements that prosecutors may seek to use at trial—rang-
ing from statements from eyewitnesses at a crime scene to
bail reports to expert forensic analyses.  Does each type of
statement demand its own primary-purpose jurisprudence?
Cf. *Smith*, 602 U. S., at 802 (distinguishing among different
types of laboratory records).

   To my mind, all this suggests we may need to rethink our
course sometime soon.  The primary-purpose test came
about accidentally.  It has caused considerable confusion.
This Court has never sought to justify it on the basis of the
Sixth Amendment's text or original meaning.  Nor, for that
matter, is it easy to see how one might.  The Sixth Amend-
ment guarantees "the accused . . . the right . . . to be con-
fronted with the witnesses against him."  What matters, as
I read those words, is not the *purpose* for which an out-of-
court statement was originally created, but whether the
government seeks to *use* a witness's statement at trial
against a defendant in lieu of live testimony.  See *Smith*,
602 U. S., at 806–807 (GORSUCH, J., concurring in part).

   When it comes to vindicating many other guarantees in
the Bill of Rights, we have eschewed "ambitious, abstract,
and ahistorical" tests in favor of ones grounded in the con-
stitutional text and the common law that informed it.  *Ken-
nedy*, 597 U. S., at 534 (internal quotation marks and alter-
ation omitted) (Establishment Clause).[1]  Perhaps we should

---

[1] See also, *e.g., SEC* v. *Jarkesy*, 603 U. S. 109 (2024) (Seventh Amend-
ment); *Ramos* v. *Louisiana*, 590 U. S. 83 (2020) (Sixth Amendment jury
right); *Knick* v. *Township of Scott*, 588 U. S. 180 (2019) (Fifth Amend-
ment Takings Clause); *Currier* v. *Virginia*, 585 U. S. 493 (2018) (Fifth
Amendment Double Jeopardy Clause); *District of Columbia* v. *Heller*, 554
U. S. 570 (2008) (Second Amendment); *United States* v. *Bajakajian*, 524
U. S. 321 (1998) (Eighth Amendment Excessive Fines Clause); cf. *Car-
penter* v. *United States*, 585 U. S. 296, 397–404 (2018) (GORSUCH, J., dis-
senting) (urging a similar approach for the Fourth Amendment).

consider doing the same here. As we recognized in *Crawford*, the Sixth Amendment enshrined a pre-existing right to confront one's accusers at trial, and its broad language "admit[s] only those exceptions established at the time of the founding." 541 U. S., at 54. In other words, the Amendment established a presumption that prosecutors cannot use out-of-court statements against a defendant without an opportunity for cross-examination, a presumption prosecutors can overcome only by identifying some historically recognized exception to the general rule. Following that approach might sometimes present courts and counsel with difficult questions, but perhaps no more so than those they face today under the primary-purpose regime. And, in any event, it is hard to see how else we might proceed if our aim is "to honor the supreme law the people have ordained rather than substituting our will for theirs." *United States* v. *Rahimi*, 602 U. S. 680, 711 (2024) (GORSUCH, J., concurring); see *Crawford*, 541 U. S., at 67.

Now may not be the moment, I concede, for the Court to take up these questions. The Court issued its latest word on the Confrontation Clause in *Smith* less than a year ago. Before weighing in again, we may benefit from the insights and further experience of our lower court colleagues. Along the way, I hope only that they pause to consider the complications surrounding the primary-purpose test and address possible alternatives we might consider. As Chief Justice Marshall observed, all of us who serve in the judiciary are charged with being "watchful of every inroad" on the rights the Confrontation Clause protects. *United States* v. *Burr*, 25 F. Cas. 187, 193 (No. 14,694) (CC Va. 1807).[2]

---

[2] JUSTICE ALITO also writes to criticize the various tests this Court has developed to determine what qualifies as a "testimonial" statement. As he observes, "the real problem may" lie not with any particular test but, more fundamentally, with the notion that the Confrontation Clause's protections hinge on whether a statement is "testimonial." *Ante,* at 2 (statement respecting denial of certiorari). So, for instance, one study

_____

cited by JUSTICE ALITO argues that "framing-era sources did not draw *any* distinction between testimonial and nontestimonial hearsay." T. Davies, Not "The Framers' Design": How the Framing-Era Ban Against Hearsay Evidence Refutes the *Crawford-Davis* "Testimonial" Formulation of the Scope of the Original Confrontation Clause, 15 J. L. & Pol'y 349, 465 (2007) (emphasis added). According to that study, "framing-era evidence doctrine imposed a virtually total ban against using unsworn hearsay evidence to prove a criminal defendant's guilt," regardless of the statement's original purpose. *Id.*, at 351; cf. *Crawford* v. *Washington*, 541 U. S. 36, 52, n. 3 (2004) (discussing evidence of a "general bar on unsworn hearsay" at the founding). If that is true, then reexamining the relevant history might well require us not only to "reaffir[m]" *Crawford*, as JUSTICE ALITO suggests, *ante,* at 4, but to broaden its protections, perhaps along the lines outlined above.