# Third District Court of Appeal

## State of Florida

Opinion filed October 8, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D23-1254
Lower Tribunal No. F17-0696
_____

**Rodney Robinson,**
Appellant,

vs.

**State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Zachary James, Judge.

Carlos J. Martinez, Public Defender, and Amy Weber, Assistant Public Defender, for appellant.

James Uthmeier, Attorney General, and Katryna Santa Cruz, Assistant Attorney General, for appellee.

Before EMAS, LOGUE, and GORDO,[1] JJ.

LOGUE, J.

_____

[1] Judge Gordo did not participate in oral argument.

Rodney Robinson appeals his conviction and sentence for sexual battery upon L.J., a minor over the age of twelve but under the age of eighteen. Robinson asserts the trial court violated his right under the Fourteenth and Sixth Amendments to the United States Constitution to confront the witnesses against him. In particular, he challenges the admission of evidence concerning the collection of bodily fluids from the victim's body at a rape treatment center and the subsequent serology testing of these samples at the Miami-Dade Police Department Crime Laboratory Bureau. For the reasons explained below, we affirm.

## BACKGROUND

### A. Sexual Battery

At trial, the evidence showed Robinson had an on-again-off-again relationship with L.J.'s mother, Ms. Thompson. The relationship had ended by the date of the charged sexual battery, January 1, 2017. Robinson, however, had been at Ms. Thompson's apartment on December 30 and 31, 2016, helping her move into the apartment.

The testimony also reflected that on January 1, 2017, Robinson entered the apartment without consent while L.J., who was then sixteen years old, was there alone. Robinson asked to borrow L.J.'s phone which she allowed. Robinson used this opportunity to view photographs saved on

2

L.J.'s phone that revealed she had sex with her boyfriend the previous evening.

L.J. showered while Robinson was at the apartment and, when she finished, she wrapped herself in a towel and went to her bedroom. Robinson, who was in Ms. Thompson's bedroom, called out for L.J. and she went to her mother's bedroom wrapped in a towel. Robinson forced L.J. to watch pornography on his cellphone, and he then asked L.J. if she wanted to have sex. When she refused, he pulled out a firearm, put it to L.J.'s head, threatened to kill her, and then vaginally penetrated L.J. with his penis. Before leaving, Robinson told L.J. that if she told her mother what occurred, he would tell her mother that L.J.'s boyfriend slept over the night before.

After Robinson left, L.J. put on a dress and then ran to a "random door and knocked" and asked the occupants, who she did not know, for help. L.J. called her mother who told her to immediately call 911. Deputy Yanick Exceus responded and found L.J. crying and distraught and noticed a "white liquid substance" coming down L.J.'s legs. Deputy Exceus transported L.J. to a rape treatment center.

At the rape treatment center, L.J. was interviewed by Detective Viera. L.J. told him the circumstances of the assault and identified Robinson as the assailant. At trial, Detective Viera testified that he noticed a "white dried

3

substance" on L.J.'s legs that "appear[ed] to be semen."

## B. Rape Treatment Center

At trial, L.J. testified that, after the assault, she noticed a white substance which had run down her left leg. After testifying to some uncertainty, L.J. ultimately testified that, in fact, a nurse performed something like "a pap smear," by swabbing her using something like Q-tips. The examining nurse was Nurse DaSilva, who filled out and signed the rape treatment center report.

At the time of trial, however, Nurse DaSilva was no longer employed at the rape treatment center and was unavailable to testify. The State instead called Armando Gomez to testify. Gomez is a nurse practitioner who is a supervisor manager at the rape treatment center and was Nurse DaSilva's supervisor in 2017. He testified that he was not involved in L.J.'s medical examination. He explained, however, the procedures that examining nurses were required to follow when conducting examinations.

During Gomez's testimony, the State sought to introduce into evidence Nurse DaSilva's rape treatment center report under the business record exception to the hearsay rule. The defense, however, objected based on both hearsay and confrontation grounds. Following voir dire of Gomez and arguments by counsel, the trial court ordered that certain of L.J.'s statements

contained in the report be excised because they did not directly relate to medical treatment. The excised statements included L.J.'s statements to Nurse DaSilva that Robinson forced her to view pornography and threatened her with a handgun. Left on the report, however, was L.J.'s statement to Nurse DaSilva that Robinson penetrated her and afterward she had "white stuff on her left leg." The trial court then admitted Nurse DaSilva's report into evidence as a business record.[2]

Gomez testified about the protocols and standards followed at the rape treatment center. Gomez, however, testified on cross-examination that although these protocols were required for examinations at the rape treatment center, he did not have personal knowledge whether Nurse DaSilva actually followed the protocols during L.J.'s medical examination. Gomez further testified that the collected evidence became part of L.J.'s rape kit provided to the Miami-Dade Police Department Crime Laboratory Bureau. A police officer testified to the delivery of L.J.'s rape kit to the Miami-Dade crime laboratory for testing.

---

[2] During voir dire outside the jury's presence, Gomez testified that the rape treatment center provides medical treatment in the sense that it offers medications, such as the morning after pill and HIV prophylactic treatment, to everyone who suspects they were exposed to bodily fluids. Gomez also explained that alleged victims are examined for physical trauma before the collection of the bodily fluids.

## C. DNA Testing

The bodily fluids were tested at the crime laboratory to investigate any matches with a DNA swab provided by Robinson. The technician who conducted the initial testing, however, was unavailable to testify at trial. The State therefore had the samples retested by a different analyst, Ms. Alvarez. Analyst Alvarez stated that her first step in retesting the samples was to determine if the samples consist of semen or some other bodily fluid. This determination is required because a different DNA test is usually used for semen than for other bodily fluids. She utilized the first serologist's preliminary test results for this first step and then used a semen DNA test. She expressly testified, however, that if she had not known whether the sample was semen, she still could have done her own DNA extraction. In fact, she explained upon questioning by the trial court, that because the test she used was specifically for semen, if the samples had contained no semen, the test would have come back negative.

Analyst Alvarez testified that her test of the samples indicated that they contained DNA that matched DNA from Robinson's oral swab. In her expert opinion, the likelihood of someone else having the same DNA was one in 14.99 septillion. The samples she tested had labels indicating the part of L.J.'s body from which they were obtained. Analyst Alvarez testified,

however, that she had no personal knowledge if the labels were accurate. The trial court admitted the samples, but instructed the jury that it should not consider the labels as evidence of where on L.J.'s body the samples were obtained.

The State rested. The trial court denied the defense's motion for judgment of acquittal. Thereafter, Robinson did not testify.

The jury found Robinson guilty of sexual battery as charged. Robinson's timely appeal followed.

## ANALYSIS

**A. The Labels and the Statements in the Rape Treatment Center Report as to the Parts of L.J.'s Body from where the Samples Were Taken.**

The portions of the rape treatment report and kit that reflect medical treatment were properly admitted as business records and did not violate Robinson's right to confrontation. In addition, Robinson also does not challenge that the subsequent DNA testing conducted by Analyst Alvarez reflected that the samples contained his semen. Instead, Robinson notes that the evidence showed he was occasionally living with the victim's mother. A reasonable doubt existed, therefore, as to whether his semen might have been accidentally and innocently transferred to the victim's body – for example, by L.J.'s contact with a towel or some other surface containing his

7

semen – rather than by the armed sexual battery described by L.J.

In this regard, Robinson argues the trial court violated his right to confront witnesses against him by admitting into evidence the labels on the samples and the statements in the rape treatment center report, which mentioned the parts of L.J.'s body from where the samples were taken. We reject this argument because the trial court expressly instructed the jury that those statements were not to be considered as evidence of what part of L.J.'s body the samples were taken from.

The Sixth Amendment Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" Amend. VI, U.S. Const. While the Sixth Amendment originally applied only to the federal government, its provisions have been incorporated into the due process provisions of the Fourteenth Amendment and thereby made applicable to the states. Ohio v. Clark, 576 U.S. 237, 243 (2015). The Confrontation Clause "bars the admission at trial of 'testimonial statements' of an absent witness unless she is 'unavailable to testify, and the defendant ha[s] had a prior opportunity' to cross-examine her." Smith v. Arizona, 602 U.S. 779, 783 (2024) (quoting Crawford v. Washington, 541 U.S. 36, 53-54 (2004)). This "prohibition applies in full to forensic evidence," and therefore, "a prosecutor cannot introduce an absent

8

laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." Id. (citing Melendez-Diaz v. Massachusetts, 557 U.S. 305, 307, 329 (2009)).

The Court explained that the Confrontation Clause "'applies only to testimonial hearsay,'—and in that two-word phrase are two limits." Id. at 784 (quoting Davis v. Washington, 547 U.S. 813, 823 (2006)). First, the Confrontation Clause applies only to testimonial statements. Second, it applies only to hearsay. Id. Because the Confrontation Clause only applies to hearsay, its terms only reach evidence admitted for the purpose of proving the truth of the matter asserted:

> [A] . . . confrontation claim can succeed only if . . . [the] statements came into evidence for their truth. As earlier explained, the Clause applies solely to "testimonial hearsay." And that means the Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." So a court analyzing a confrontation claim must identify the role that a given out-of-court statement . . . served at trial. . . . If . . . [the] statements came in to establish the truth of [matters contained in the statements], then the Clause's alarms begin to ring; but if [the] statements came in for another purpose, then those alarms fall quiet.

Id. at 792-93 (internal citations omitted) (alterations added).

Here, the trial court expressly instructed the jury, "you shouldn't accept that testimony for the truth that each particular specimen came from

9

that particular location because we don't actually know. . . . [T]here is no testimony that they're correctly labeled." And the trial court repeated the instruction when upholding a defense objection to the State's closing argument. Because the Confrontation Clause applies only to out-of-court statements that are used to establish the truth of the matter asserted, and the trial court ordered the jury to not rely on the labels and statements for the truth of where on L.J.'s body the samples were obtained, the admission of the labels and statements did not violate the Confrontation Clause. The labels and statements only served to explain Analyst Alvarez's thought process in retesting some samples and not others.

Of course, the State was still left to deal with Robinson's argument that reasonable doubt existed whether his semen appeared on L.J.'s body as a result of an innocent transfer caused by L.J. touching a towel or surface containing his semen. But that is not a Confrontation Clause issue. And while the jury as finder-of-fact could have reached that conclusion, the jury here obviously rejected it. And, indeed, the record contains facts from which a finder-of-fact could conclude that the transfer of Robinson's semen onto L.J. was not innocent and could infer the samples came from her vagina and leg. Such evidence includes (1) L.J.'s statement that Robinson penetrated her while holding a gun to her head; (2) L.J.'s two statements describing a white

10

substance on her left leg; (2) L.J.'s statement that the rape treatment center nurse performed something like a pap smear using something that looked like Q-tips; (3) Deputy Exceus' testimony that he noticed a "white liquid substance" coming down L.J.'s legs; and (4) Detective Viera's testimony that, at the rape treatment center, he saw a "white dried substance" on L.J.'s legs that "appear[ed] to be semen."

## B. The DNA Analyst's Use of the Serologist's Identification of Semen to Use a Semen Test on the Samples.

Robinson also contends his right to confront witnesses was violated by Analyst Alvarez's testimony regarding the results of her retesting of the samples. Smith v. Arizona, the United States Supreme Court's most recent Sixth Amendment case, disposes of this argument. Smith involved a prosecution for illegal drug possession. Substances found on Smith's property were tested in a laboratory and determined to be methamphetamine, marijuana, and cannabis. The expert who conducted the testing, however, was unavailable for trial. Therefore, a substitute expert testified based solely on the tests conducted by the missing expert. The substitute expert testified how the lab typically functions, such as the lab's precautions, standards, and procedures. In addition, the substitute expert testified to the test results the missing expert set forth in her report. As the Court held, Smith's Sixth Amendment rights were violated because the

11

substitute expert served merely as the missing expert's "mouthpiece." Smith, 602 U.S. at 800. Assuming the evidence was testimonial, the Confrontation Clause gave Smith the "right to confront the person who actually did the lab work, not a surrogate merely reading from her records." Id.

Of course, here, Analyst Alvarez retested the samples and testified only to her own methodology and conclusions. Robinson had the ability to, and did in fact, cross-examine Analyst Alvarez regarding her methodology and conclusions. Indeed, the Supreme Court has approved a substitute expert's retesting of samples as a method to avoid Confrontation Clause issues when the original expert is no longer available to testify. See Bullcoming v. New Mexico, 564 U.S. 647, 666 (2011) ("New Mexico could have avoided any Confrontation Clause problem by asking [the substitute expert] to retest the sample and then testify to the results of his retest rather than to the results of a test he did not conduct or observe.").

Robinson, however, points out that Analyst Alvarez, the substitute expert, relied on the finding of the serologist that the sample contained semen. This use, he asserts, violated his right to confrontation. We are not persuaded. Analyst Alvarez did indicate that the first step in testing DNA is to conduct serology testing of the samples to determine if they are presumptively positive for semen or some other bodily fluid. This is so

because a different DNA test is usually used for semen than for other bodily fluids. Analyst Alvarez utilized the serologist's preliminary test results for this first step and then used a semen DNA test. However, she expressly testified that if she had not known whether the sample was semen, she could still do her own DNA extraction. In fact, she explained upon questioning by the trial court, that because the test she used was specifically for semen, if the sample had not contained semen, the test result would have been negative. Therefore, her testing for semen on the sample was, in effect, a retesting of the serologist's finding of semen in the sample. Analyst Alvarez's crucial testimony reflects there was a DNA match between the sample obtained from the victim and the oral swab obtained from Robinson, and Robinson had a full opportunity to examine Analyst Alvarez on her findings in this regard.

Affirmed.

GORDO, J., concurs.

13

I concur in the result reached by the majority, but not its rationale. I conclude that, under the facts of the case, the error complained of was harmless. See State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986); see also Johnson v. State, 53 So. 3d 1003, 1011 (Fla. 2011) (observing: "The United States Supreme Court has repeatedly recognized that even constitutional errors are ordinarily subject to harmless-error analysis."); Corona v. State, 64 So. 3d 1232, 1241 (Fla. 2011) (reaffirming that "[v]iolations of the Confrontation Clause, where preserved, are subject to harmless error analysis.") (citing State v. Contreras, 979 So. 2d 896, 911 (Fla. 2008)); Williams v. State, 947 So. 2d 517 (Fla. 3d DCA 2006) (holding: "[E]ven if the victim's statements to the police are inadmissible under Crawford [v. Washington, 541 U.S. 36 (2004)], the evidence is cumulative and any error is harmless beyond a reasonable doubt.").