**Opinion issued March 19, 2026**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00338-CR

_____

**LUIS NOGUERA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 209th District Court**
**Harris County, Texas**
**Trial Court Case No. 1769799**

---

## MEMORANDUM OPINION

A jury found Luis Noguera guilty of aggravated robbery.[1]  After finding an enhancement paragraph to be true, the trial court assessed Noguera's punishment at 45 years' imprisonment.  On appeal, Noguera argues that the trial court erred by

---

[1]   *See* TEX. PENAL CODE § 29.03(a)(2).

denying his motion to sever and by admitting certain testimony that allegedly violated his federal constitutional right to confrontation. He also contends that his trial counsel was ineffective.

We affirm.

## Background

Rina Acevedo rode the bus to work but was saving to buy a car. While waiting at the bus stop, Acevedo met Noguera and asked him if he knew anyone selling a car. He told her that his aunt was a used car dealer, and they exchanged phone numbers. Later that day, Noguera called Acevedo and went to her apartment. They talked and then had sex. Noguera left the next morning but returned a few hours later with a car. Acevedo's daughter test drove the car, and Acevedo agreed to buy it for $4,000.

Acevedo withdrew $4,000 in cash from her bank. She and Noguera left in the car to go to his aunt's dealership to sign paperwork. Noguera was driving. He parked the car along a street where he said his aunt lived and told Acevedo they needed to wait there.

While waiting, they got into the backseat and began having sex. Acevedo asked Noguera to stop. He did and climbed into the front seat. Noguera told Acevedo that he had a surprise for her and asked her to close her eyes. When she

2

opened her eyes, he was pointing a gun at her forehead. Noguera ordered Acevedo out of the car and drove away, taking her money and cell phone.

Acevedo called the police. She gave them Noguera's phone number, which they used to find Noguera on social media. When shown a photo array with Noguera's picture, Acevedo and her daughter each identified Noguera as the suspect.

Noguera was charged with two offenses: (1) unlawful possession of a firearm and (2) aggravated robbery. Regarding the unlawful-possession offense, the indictment alleged that Noguera had a prior conviction for felony burglary.

Six months before trial, the State filed its notice of intent to consolidate the two cases. On the first day of trial just before voir dire, Noguera moved to sever the two offenses for separate trials. The trial court denied the motion.

The State presented the testimony of Acevedo, her daughter, and the investigating police officers. The jury found Noguera not guilty of unlawful possession of a firearm but found him guilty of aggravated robbery.

Noguera changed his punishment election from the jury to the trial court. He pleaded true to an enhancement paragraph for a prior robbery conviction and stipulated that he had eight prior convictions—five felonies and three misdemeanors. The State offered the judgments for each conviction.

During the punishment phase, the State presented evidence showing that Noguera had also committed two unadjudicated extraneous offenses: aggravated

3

sexual assault and aggravated robbery. For each offense, the respective complainant testified, identifying Noguera in court as the perpetrator. And the evidence showed that the robbery complainant identified Noguera as the robber in a pretrial photo array.

The State also offered DNA evidence connecting Noguera to each extraneous offense. This included the testimony of the DNA analysts who compared Noguera's DNA profile with the profile developed from DNA evidence collected in each case.

At the end of the punishment phase, the trial court found the enhancement paragraph true and assessed Noguera's punishment at 45 years' imprisonment.

**Motion to Sever**

In his first issue, Noguera contends that the trial court erred by denying his motion to sever the two offenses for which he was charged: unlawful possession of a firearm and aggravated robbery. The State responds that the trial court did not err because the motion was untimely.

When, as here, two offenses arise out of the same criminal episode, they may be consolidated for trial. TEX. PENAL CODE § 3.02(a). Subject to exceptions not applicable here, "[w]henever two or more offenses have been consolidated or joined for trial under Section 3.02, the defendant shall have a right to a severance of the offenses." *Id.* § 3.04(a). When a *timely* request for severance is made under Section

4

3.04(a), "the defendant's right to a severance is absolute, and severance is mandatory." *Coleman v. State*, 788 S.W.2d 369, 371 (Tex. Crim. App. 1990).

A motion to sever is a "pleading of the defendant" governed by Code of Criminal Procedure article 28.01. *Thornton v. State*, 986 S.W.2d 615, 617 (Tex. Crim. App. 1999); *see* TEX. CODE CRIM. PROC. art. 27.02(8), 28.01, § 1. Article 28.01 provides that a trial court may set "a pre-trial hearing before [the case] is set for trial upon [the] merits." TEX. CODE CRIM. PROC. art. 28.01, § 1. The pretrial hearing "shall be to determine" the defendant's pleadings (and other matters). *Id.* The Court of Criminal Appeals has held that a motion to sever must be raised pretrial to be timely. *See Thornton*, 986 S.W.3d at 817–18; *see also Writt v. State*, 541 S.W.2d 424, 425–26 (Tex. Crim. App. 1976) (recognizing that pretrial motion filed "the day of trial" was untimely and trial court did not err in denying it).

Here, the State filed its notice to consolidate the two cases six months before trial. The record shows that a motion to sever was never filed. Noguera asserted an oral motion to sever on the first day of trial just before voir dire began. As a result, Noguera's oral motion to sever was untimely—and the trial court did not err in denying it. *See Thornton*, 986 S.W.3d at 618; *Garcia v. State*, No. 01-19-00081-CR, 2020 WL 3969671, at *7 (Tex. App.—Houston [1st Dist.] July 14, 2020, pet. ref'd)

(mem. op., not designated for publication) (holding that oral motion to sever made "just before the start of voir dire on the first day of the trial's setting" was untimely).[2]

We overrule Noguera's first issue.

## Right to Confrontation

In his second issue, Noguera contends that the trial court "violated [his] constitutional right to confrontation by allowing testimony from a DNA analyst," connecting him to an extraneous aggravated robbery offense.

### A.     Relevant Background

In the punishment phase, the State offered evidence to prove that Noguera committed an unadjudicated extraneous offense of aggravated robbery.

Dygrin Portillo Espinal testified that, after he parked at his apartment complex, a man approached him, pointed a gun at his head, and demanded his car keys. He recognized the man because he had previously seen him around the apartment complex and at the post office. Espinal gave the man his car keys, and the man drove away in his car.

In court, Espinal identified Noguera as the man who robbed him. Evidence showed that the police recovered a gun from the glove box of a vehicle in which

---

[2]     *See also Hemphill v. State*, Nos. 03-99-00784-CR & 03-99-00785-CR, 2000 WL 962846, *3 (Tex. App.—Austin July 13, 2000, pet. ref'd) (not designated for publication) (holding that severance motion filed "just before beginning jury voir dire" was untimely).

6

Noguera was a passenger at the time. Espinal agreed that the gun looked like the one used to rob him.

Detective T. Fontenot of the Houston Police Department testified that the apartment complex manager gave him photos taken inside the complex of the robbery suspect. Detective Fontenot compared those photos to photos of Noguera and concluded that Noguera "matched" the person in the apartment complex photos. Detective Fontenot created a photo array from which Espinal identified Noguera as the robber.

Detective Fontenot obtained a search warrant to collect Noguera's DNA by buccal swab. Espinal voluntarily provided a DNA sample. After Espinal's car was recovered, a crime scene investigator swabbed its interior and exterior to collect DNA evidence.

Noguera's and Espinal's buccal swabs and the swabs from the car were sent to the Houston Forensic Science Center (HFSC) for DNA testing. Aja Moss, an HFSC analyst, testified that he performed a comparative DNA analysis of Noguera's and Espinal's buccal swabs and the swabs from the car. He did so by interpreting and comparing data generated from laboratory work performed on the samples by two other HFSC analysts. Moss testified that he authored a report containing the results of his comparative analysis.

Before the report was admitted into evidence, Noguera objected that he had "the right to confront and cross-examine whoever actually did the [DNA] test." The trial court overruled the objection and granted Noguera a running objection. The State then offered Moss's report into evidence. Referencing the report, Moss testified that there was "very strong support" that Noguera was a contributor to the DNA found on the car's steering wheel.

## B.    Applicable Law

The Sixth Amendment's Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. The Confrontation Clause "bars the admission at trial of an absent witness's statements—however trustworthy a judge might think them—unless the witness is unavailable and the defendant had a prior chance to subject her to cross-examination." *Smith v. Arizona*, 602 U.S. 779, 784 (2024). This prohibition applies to "testimonial hearsay," which means it is confined to (1) testimonial statements (2) offered to prove the truth of the matter asserted. *Id.* at 784–85.

The Confrontation Clause's prohibition against testimonial hearsay encompasses forensic analyses. *Id.* at 783. Thus, "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." *Id.*

8

Error in the admission of testimonial statements in violation of the Confrontation Clause is constitutional error reviewed under the harm standard stated in Rule of Appellate Procedure Rule 44.2(a). *Allison v. State*, 666 S.W.3d 750, 763 (Tex. Crim. App. 2023); *see* TEX. R. APP. P. 44.2(a). Constitutional error requires reversal of the judgment "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a).

When determining whether constitutional error under the Confrontation Clause is harmless, the following factors are relevant to our analysis: (1) the importance of the out-of-court statement to the State's case, (2) whether the out-of-court statement was cumulative of other evidence, (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points, and (4) the overall strength of the State's case. *Allison*, 666 S.W.3d at 763–64. We may also consider the source and nature of the error, the extent, if any, that the error was emphasized by the State, and how much weight the factfinder might have placed on the erroneously admitted evidence compared to the remainder of the evidence. *Id.* at 764.

## C. Analysis

Noguera contends that the trial court erred in permitting Moss's testimony conveying the results of his comparative DNA analysis. He asserts that his "right to confrontation under the Sixth Amendment to the United States Constitution was

violated when the trial court allowed [Moss] to testify about the work of other non-testifying analysts" on whose work Moss relied in conducting his comparative analysis. The State counters that, even if that trial court erred in admitting Moss's complained-of testimony, any error was harmless. Assuming without deciding that the trial court erred in admitting the testimony, we agree that any error was harmless.

Here, the State offered Moss's testimony that Noguera's DNA was on the steering wheel to prove Noguera's identity as the robber. But other evidence, offered before Moss testified, identified Noguera as the robber, tempering the importance of Moss's testimony.

Espinal (the complainant) identified Noguera as the robber in court and in a pretrial photo array. Noguera asserts that "eyewitness identification is notoriously unreliable." However, other evidence supported the reliability of Espinal's identification. The evidence showed that Noguera had a distinctive hairstyle and tattoos. Espinal indicated that he recognized Noguera because he had seen him "in two locations" at his apartment complex and at the post office. *See McGuire v. State*, 631 S.W.3d 222, 231 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (explaining that witness's familiarity with defendant—witness had seen defendant at neighborhood corner store—weighed in favor of identification's reliability). And Espinal testified that, although he was robbed at night, the "lighting was good," and he saw the robber "plainly." The witness-admonishment form accompanying the

10

photo array reflected that Espinal "immediately" selected Noguera's photo and stated that he was "100% this [was] the person who assaulted [him] and stole [his] car." He said that looking at Noguera's photo "scared" him.

Besides Espinal's identification, other unchallenged evidence also connected Noguera to the extraneous aggravated robbery. The apartment complex manager gave Detective Fontenot photos of the robbery suspect consistent with Noguera's appearance. The photos were admitted into evidence. Detective Fontenot compared the photos to known photos of Noguera, concluding that Noguera "matched" the person in the photos. The evidence also showed that Noguera was arrested in his girlfriend's car. A gun was recovered from the vehicle's glove box. The girlfriend owned the gun, but Noguera was in the passenger seat where the gun was within his reach. Espinal testified that the gun looked like the gun used to rob him. Considering Espinal's identification and the other non-DNA evidence, the State's evidence connecting Noguera to the robbery was strong without Moss's DNA testimony.

Noguera also asserts that the State "emphasized the extraneous aggravated robbery" in its closing argument. He points out that, in discussing the offense, the State argued that the extraneous offense "show[ed] how brazen this defendant ha[d] become and it show[ed] how incapable he thinks the criminal justice system is of ever holding him accountable." However, before discussing the extraneous

11

aggravated robbery, the State also discussed the evidence underlying the instant aggravated robbery and an unadjudicated aggravated sexual assault (discussed below). In discussing the extraneous aggravated robbery, the State did not mention Moss's DNA testimony linking Noguera to the stolen car. Instead, the State emphasized that 23 days after committing the extraneous aggravated sexual assault, Noguera committed the extraneous aggravated robbery. And 13 days after being released from custody for the extraneous aggravated robbery, Noguera committed the aggravated robbery in this case. The State then discussed Noguera's seven prior convictions, ranging from misdemeanor evading arrest to terroristic threats of a family member to felony burglary and robbery. Considering all Noguera's past and present offenses, the State argued that Noguera's crimes were escalating and asked the trial court to sentence Noguera to life in prison.[3]

Assuming without deciding that the trial court erred, we conclude beyond a reasonable doubt that the admission of Moss's DNA testimony did not contribute to Noguera's punishment of 45 years' imprisonment assessed by the trial court. *See* TEX. R. APP. P. 44.2(a); *McNac v. State*, 215 S.W.3d 420, 424–25 (Tex. Crim. App. 2007) (holding that any error in admitting evidence during punishment phase in

---

[3]    Because the trial court found the enhancement paragraph to be true after Noguera pleaded true, the punishment range for the aggravated-robbery offense was 15 to 99 years or life in prison, plus a $10,000 fine. *See* TEX. PENAL CODE §§ 12.42(c)(1), 29.03(b).

violation of Confrontation Clause was harmless where evidence was cumulative of other unchallenged evidence).[4] Accordingly, we hold that even if the trial court erred in admitting Moss's complained-of testimony (which we do not decide), the error was harmless. *See* TEX. R. APP. P. 44.2(a).

We overrule Noguera's second issue.[5]

## Ineffective Assistance of Counsel

In his third issue, Noguera contends that his counsel was ineffective for failing to lodge a Confrontation Clause objection to a forensic analyst's testimony that Noguera's DNA could not be excluded as a contributor to the male DNA profile recovered from the female complainant in the extraneous aggravated-sexual-assault case.

---

[4] *See also Hamilton v. State*, 300 S.W.3d 14, 22 (Tex. App.—San Antonio 2009, pet. ref'd) (holding that any error in admitting DNA testimony in violation of Confrontation Clause was not constitutionally harmful because other evidence of appellant's guilt was strong, including complainant's identification testimony); *Richards v. State*, No. 14-23-00968-CR, 2025 WL 2048011, at *6 (Tex. App.—Houston [14th Dist.] July 22, 2025, no pet.) (mem. op., not designated for publication) (concluding that evidence violating Confrontation Clause admitted during punishment phase was not harmful because it was cumulative of unchallenged evidence and noting that trial court assessed appellant's sentence at 30 years' imprisonment out of 5-to-99-year sentencing range despite State's request for 60-year sentence).

[5] The State also argues that we should overrule Noguera's challenge to the admission of Moss's testimony because "the Confrontation Clause does not apply to the punishment phase of a bifurcated trial where the testimony was not offered to escalate the range of punishment." However, given our disposition of the second issue, we need not address the State's argument.

## A. Relevant Background

During the punishment phase, the State also offered evidence to prove that Noguera committed the unadjudicated offense of aggravated sexual assault. The complainant, D.J., testified. During her testimony, the State introduced a report prepared by a sexual assault nurse examiner (SANE) who examined D.J. after the assault. D.J. testified that the report contained "a true and accurate depiction of what happened."

The report stated that D.J. went to a party with a friend. After her friend left, D.J. accepted a ride with a man who she met at the party. During the drive, the man pulled onto a dark street. There, the man "had sex with [D.J.] at gunpoint." D.J. said the sex "was not consensual at all." The man told D.J. that he would shoot her if she did not cooperate. When he left, the man took D.J.'s phone, wallet, and identification.

The SANE testified that, as part of the exam, she collected a sexual assault kit. This included buccal swabs to establish D.J.'s DNA and swabs from D.J.'s vagina and labia to test for the perpetrator's DNA.

Seven months after D.J.'s sexual assault, the case was reactivated when there was a "CODIS hit" on DNA collected from D.J. After further investigation, Noguera became the suspect in the case. The police obtained a search warrant to acquire Noguera's DNA by buccal swab.

14

Jessica Powers, an HFSC analyst, compared the DNA profile obtained from one of D.J.'s labial swabs with the DNA profile obtained from Noguera's buccal swab. Powers authored a report stating her interpretations of the DNA profiles and the results of her comparative analysis.

Powers testified that the swabs from D.J's sexual assault kit were sent to an outsourced lab for processing. She said that she reviewed the outsourced lab's report and its conclusions to confirm that she agreed with them. She also reviewed "all of their worksheets, their controls, and their data." She explained that "data" means "electropherograms," which are "charts or graphs with peaks that represent a DNA profile." She confirmed that "in forming [her] opinion in this case," she "reviewed the electropherograms."

Powers stated that HFSC tested Noguera's "known reference sample"—his buccal swab. Describing HFSC's testing process, Powers explained that a swab is cut after it arrives at HFSC's lab. A swab cutting is placed in a tube and then "go[es] through the lab process, which is extraction, quantification, amplification, and CE load." The CE load generates the electropherograms, which Powers interprets before writing her report.

Powers also testified that a former HFSC employee was terminated for committing errors, including "possibly switching a sample" in another case. The former employee performed a portion of the lab work on Noguera's buccal swab.

15

However, Powers confirmed that the "problematic work" resulting in the employee's termination was not performed in this case.

When the State sought to admit Powers's report, Noguera objected that the report was "not credible and reliable." The trial court overruled the objection, admitting the report and giving Noguera a "running objection to this testimony, as well."

Powers then testified that, based on her comparative analysis, Noguera could not be excluded as a possible contributor to the DNA profile obtained from the swab of D.J.'s outer labia. She explained, "The probability that a randomly chosen unrelated individual would be included as a possible contributor to this DNA profile is approximately 1 in 101 septillion individuals." These results and interpretations were also contained in Powers's report.

On appeal, Noguera complains that he received ineffective assistance of counsel because his trial counsel did not object to Powers's report and testimony based on the Confrontation Clause.

**B.    Standard of Review**

The United States Constitution, Texas Constitution, and Texas Code of Criminal Procedure guarantee an accused the right to assistance of counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. art. 1.051. As a matter of state and federal law, this includes the right to reasonably effective

16

assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997).

To prevail on a claim of ineffective assistance of counsel, an appellant must prove by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness and that (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A failure to make a showing under *either* prong of the *Strickland* test defeats a claim for ineffective assistance. 466 U.S. at 697; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Under *Strickland*'s first prong, we must look to the totality of the representation to determine the effectiveness of counsel—indulging a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. 466 U.S. at 689; *Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). Moreover, we "must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

17

Allegations of ineffectiveness must be firmly founded in the record. *Thompson*, 9 S.W.3d at 813. In most cases, a direct appeal is an inadequate vehicle for raising an ineffective-assistance claim because the record is undeveloped, and a silent record cannot adequately reflect the motives behind trial counsel's actions. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003); *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

When, as here, the record does not reveal the reasons for trial counsel's actions, we "will assume a strategic motivation if any can possibly be imagined." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Trial counsel should generally have an opportunity to explain his or her actions before we find the performance deficient. *Goodspeed*, 187 S.W.3d at 392. Without that opportunity, we should not find trial counsel's performance deficient "unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Garcia*, 57 S.W.3d at 440).

In rare cases in which counsel's ineffectiveness is apparent from the record, an appellate court may address the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. But "the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.*

Under *Strickland*'s second prong, we must determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* That an error had "some conceivable effect on the outcome" will not suffice. *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010).

## C.     Analysis

Noguera argues that his trial counsel was deficient because he did not lodge a Confrontation Clause objection to Powers's testimony revealing the results of her comparative analysis of the DNA profiles generated by non-testifying lab analysts. To support his argument, Noguera relies on the United States Supreme Court's decision in *Smith*. *See* 602 U.S. at 798–800. Noguera asserts that "*Smith v. Arizona* makes clear that the Confrontation Clause applies in the context of forensic analysis when the out-of-court statement is the work of a non-testifying analyst, and that work is later relied upon for its truth by the testifying witness."

The State points out that *Smith* was decided on June 21, 2024, over one month after Noguera's trial. *See id.* at 779. The State asserts that pre-*Smith* law did not require defense counsel to object to Powers's testimony.

We are mindful that we must evaluate counsel's performance at the time of his representation and not through "the distorting effects of hindsight." *Ex parte*

19

*Salinas*, 664 S.W.3d 894, 909 (Tex. Crim. App. 2022) (quoting *Strickland*, 466 U.S. at 689–90). Because "a bar card does not come with a crystal ball," the Court of Criminal Appeals recognized that "the specific legal proposition" forming the basis of counsel's alleged deficiency "must be well considered and clearly defined." *Ex parte Chandler*, 182 S.W.3d 350, 358 (Tex. Crim. App. 2005) (internal quotation marks omitted). We "measure counsel's performance against the state of the law in effect during the time of trial" and "will not find counsel ineffective where the claimed error is based upon unsettled law." *Ex parte Lane*, 670 S.W.3d 662, 671 (Tex. Crim. App. 2023) (quoting *Ex parte Chandler*, 182 S.W.3d at 358).

Twelve years before *Smith*, the Supreme Court decided *Williams v. Illinois*, 567 U.S. 50 (2012). There, Williams challenged his conviction for aggravated sexual assault. *Id.* at 64. The evidence at trial showed that the state police lab sent the victim's sexual-assault kit to a private lab, Cellmark, for DNA testing. Cellmark developed a DNA profile from the semen detected on the victim's vaginal swabs and sent its report containing the DNA profile to the police lab. *Id.* at 59. A police lab analyst searched the state DNA database and found that the profile matched Williams's DNA profile developed after his arrest for an unrelated charge. *Id.*

At trial, the prosecution's forensic expert, a police lab employee, testified that she compared the DNA profile contained in the Cellmark report—which was not admitted into evidence—to Williams's known DNA profile. *Id.* at 61. She said that

20

her comparison showed that Williams's DNA profile matched the DNA profile in the Cellmark report. *Id.* at 62. Williams moved to exclude the expert's testimony based on the Confrontation Clause "with regards to testing done by [Cellmark]." *Id.* He argued that there was "no evidence with regards to . . . any work done by [Cellmark] to justify testimony coming into this case with regard to their analysis." *Id.* at 62–63. The trial court sided with the prosecution. *Id.* at 63.

Ultimately, the case made its way to the United States Supreme Court. Justice Alito authored the plurality opinion, joined by Chief Justice Roberts and Justices Kennedy and Breyer. *Id.* at 55. The *Williams* plurality concluded that the Cellmark report was not offered for its truth. *Id.* at 78. Rather, it was offered to explain the basis underlying the expert's independent conclusion that the samples matched. *Id.* 78–79. The plurality noted that, under Federal Rule of Evidence 703, "basis evidence" for an expert's opinion may be disclosed "[to] help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion." *Id.* at 79. Because the Cellmark report was not offered for its truth, the plurality held that the expert's testimony did not violate Williams's Sixth Amendment confrontation rights. *Id.*

The five other justices in two opinions (Justice Thomas, concurring in the judgment, and Justice Kagan, joined by three other justices, dissenting) concluded that the Cellmark report was offered for its truth. *Id.* at 108, 126 (Thomas, J.,

21

concurring) (Kagan, J., dissenting). However, those opinions differed on one point: Justice Thomas concluded that the report was not testimonial, but the dissenting justices found that it was.[6] *Id.* at 111, 138 (Thomas, J., concurring) (Kagan, J., dissenting).

The Supreme Court later recognized that the fractured opinions in *Williams* had "sown confusion in courts across the country about the Confrontation Clause's application to expert opinion testimony." *Smith*, 602 U.S. at 789 (internal quotation marks omitted). The Court observed that *Smith* "emerged out of that muddle." *Id.*

In *Smith*, an analyst tested several items for the presence of drugs and prepared "a set of typed notes and a signed report . . . about the testing." *Id.* at 790. At trial, a different analyst testified. He explained "what [the non-testifying analyst's] records conveyed about her testing of the items." *Id.* at 791. The testifying analyst then provided an "independent opinion" about the testing results based on those records. *Id.* at 791.

The Court clarified that "[w]hen an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Id.* at 783. As a result, "the Confrontation Clause will bar [the] admission" of those statements if they are

---

[6]    The plurality also concluded that the report was not testimonial but for a different reason than Justice Thomas. *Williams v. Illinois*, 567 U.S. 50, 84–85 (2012); *id.* at 111–12 (Thomas, J., concurring).

also testimonial. *Id.* The Court emphasized that the rules of evidence, including the rules governing the admissibility of expert opinions, do not control the inquiry into whether a non-testifying analyst's statements were admitted for their truth. *Id.* at 794. "Instead, we conduct an independent analysis of whether an out-of-court statement was admitted for its truth, and therefore may have compromised a defendant's right of confrontation." *Id.* The Court held that the non-testifying analyst's statements in *Smith* "came in for their truth . . . because they were admitted to show the basis of [the testifying analyst's] expert opinions."[7] *Id.* at 798.

As support for his ineffective-assistance-of-counsel claim, Noguera asserts: "Just as in *Smith*, the statements of the other analysts came in for their truth; they were admitted to show the basis for Moss's opinions. . . . All of Moss's opinions were predicated on the truth of the other analysts' statements[.]"

But when this case was tried, the law governing whether an absent analyst's statements that form the basis of a testifying expert's opinion were offered for their truth was not "well considered and clearly defined." *Ex parte Chandler*, 182 S.W.3d at 358; *see Smith*, 602 U.S. at 789 (describing confusion caused by *Williams*). Instead, the law was unsettled. And Noguera's trial counsel was not deficient for failing to object to Moss's testimony based on unsettled law. *See Ex parte Salinas*,

---

[7] The Supreme Court remanded the case to the trial court to determine whether the non-testifying analyst's statements were testimonial. *Smith v. Arizona*, 602 U.S. 779, 803 (2024).

664 S.W.3d at 909 (explaining that courts "do not ordinarily declare counsel to have performed deficiently for failing to invoke unsettled legal principles").

Accordingly, we hold that Noguera has failed to show, by a preponderance of the evidence, that he received ineffective assistance of counsel at trial. *See Strickland*, 466 U.S. at 687–88.

We overrule Noguera's third issue.

## Conclusion

For all of the reasons above, we affirm the judgment of the trial court.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).